IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| SILVIO BALTODANO<br><br>Plaintiff<br><br>vs<br><br>MERCK SHARP & DOHME (I.A.) CORP.<br>NILDA VAZQUEZ AND JOHN DOE, and<br>their conjugal partnership<br><br>Defendants | CIVIL 07-1632CCC |

**O R D E R**

In the diversity action now before us, plaintiff Silvio Baltodano,, alleges employment discrimination based on Puerto Rico Law 100, 29 L.P.R.A. §§146,146a for discrimination based on national origin;[1] unjust employment termination under Puerto Rico Law 80, 29 L.P.R.A. §185a; Law 17, 29 L.P.R.A. §155 et. seq., for breach of contract under 31 L.P.R.A. §§3391-3525 and for damages under Article 1802 of the Civil Code of Puerto Rico, 31 L.P.R.A.§3151, by his former employer defendant Merck Sharp & Dohme (I.A.)[2] (Merck).

The case is now before us on Merck's Motion for Summary Judgment filed June 16, 2008 **(docket entry 28)**, which plaintiff opposed (**docket entry 31**). Defendant replied (**docket entry 39**) and plaintiff filed a sur-reply (**docket entry 56**).

---

[1] Baltodano does not identify his national origin in his complaint or in the opposition to the motion for summary judgment.

[2] The caption of the complaint identifies Merck Sharp & Dohme (I.A.) as the only defendant. At ¶ 5 of the complaint, plaintiff identifies it as the "wholly owned subsidiary of defendant Merck & Company, Inc. (Merck Caribbean and Merck Whitehouse, respectively)...." Throughout the complaint, plaintiff refers only to "Merck" without distinguishing to which entity it is referring. Inasmuch as only one entity was summoned–Merck Sharp & Dohme (I.A.)– we will use "Merck" to refer to that entity only and find that the parent company is not a party to this case.

CIVIL 07-1632CCC                                         2

## I. Alleged Facts of the Case

The facts as alleged in the complaint are as follows:

Baltodano, a Florida resident, began his career with Merck in its CANDEAN region in April, 1996 as a sales representative in Nicaragua. In January, 1997 he was transferred to Costa Rica and was promoted to Associate Product Marketing Manager. Another promotion in October, 1998 resulted in a move to Florida. Yet another promotion brought him to Puerto Rico, which is part of Merck's Caribbean region, in November 2003, where he was again promoted in June 2005 to National Business Manager.

Due to an organizational restructuring of the company, Merck assigned plaintiff to the position of Primary Care Business Manager in which he was supervised by Vincent Caballero until August, 2006. At that time, Baltodano and five other business managers came under the direct supervision of defendant Nilda Vázquez, who had previously supervised Caballero (¶18), and Wendy Perry, his supervisor from June to December 2005 (¶38, Unsworn statement of Wendy Perry, docket entry 29, Ex12,¶2).

Plaintiff alleges that he first began having problems in his career with Merck (¶19) while Vázquez was still Caballero's supervisor. He claims to have suffered discrimination based on his national origin, which he never identifies, describing it in the complaint as follows:

> 21. Ms. Vázquez constantly emphasized and reiterated that the Puerto Rico Region was superior to the CANDEAN Region, where Mr. Baltodano came from, because the CANDEAN Region has never reached the CARIBBEAN Region revenues. CANDEAN is not regulated by the U.S. Food [and Drug] Administration.
>
> 22. Ms. Vázquez made Mr. Baltadano feel inferior because he was from a different region.
> ...
> 26. Mr. Baltodano told Ms. Vázquez that while he knew that she was very serious, he and others would appreciate more interaction with her at the sales meetings.
>
> 27. Ms. Vázquez did not respond.

CIVIL 07-1632CCC                                         3

>     28. It was not until November 2004, when Ms. Vázquez and Mr. Baltodano were at a meeting alone that she told him that she did not appreciate his feedback given to her at the May 2004 sales meeting.
>
>     29. Ms. Vázquez emphasized her position that this type of feedback was not appropriate in Puerto Rico, and that [he] should be more careful since he was from a different region.
>
>     32. Ms. Vázquez made it clear that [plaintiff's] feedback to her was not important because he was not from Puerto Rico and therefore . . . did not and could not understand the local culture.

Plaintiff alleges that once Vázquez became his direct supervisor, she dismissed him and assured him that he had no opportunity to be transferred to Merck USA, as he hoped to do.(¶35).  At ¶36 "Mr. Baltodano concedes that he had certain administrative failures, but he accepted responsibility of not complying exactly as the company policy requires." He further alleges that, "[i]n all cases, however, [he] was held to a higher standard than his peers who were from Puerto Rico" (¶37).

On December 16, 2005 Baltodano received a memo stating he had failed to follow work instructions related to taking product certification tests for Vytorin, Fosamax and Zetia, according to the dates established by his supervisor, Wendy Perry (¶38).  He accepted the contents but stated that the company should allocate more time for the completion of this type of test (¶39).

On June 2, 2006, plaintiff received a second final reprimand, related to a different topic.  He was required to sign it, even though he did not agree with the contents of the memorandum (¶43).  The reprimand did not arise from poor performance; rather, it related to Baltodano's failure to provide documentation of his business expenses incurred during 2005 through a system known as "ez-expense" (¶¶47-48).

Baltodano alleges that he was again reprimanded for untimely submitting his expense report after a national meeting he attended during the first week of November, 2006 (¶¶55-57).  Instead of submitting the report within thirty days after having incurred it, as required

CIVIL 07-1632CCC                                           4

by the policy, he did so on December 15, 2006. Plaintiff avers that, as a result of the two written warnings, he was notified of his dismissal as an employee effective January 18, 2007.

Plaintiff also claims that in February, 2007, he applied for a position in Miami, Florida, as a Regional Manager with Steifel Laboratories. He claims that on March 26, 2007 he was told by Steifel's Vice President for Latin America, Bresly Jaramillo, that he had been selected for the position and would soon receive a formal job offer letter (¶¶ 104-107). The following day, however, Jaramillo called plaintiff to tell him the offer had to be withdrawn because Merck Puerto Rico had given him a negative reference (¶¶109-113). Specifically, "Mr. Jaramillo said that he was informed that Mr. Baltodano had left [Merck Puerto Rico] in bad terms and, that Mr. Simich, Merck Puerto Rico's Managing Director,[3] said he had 'no comments on Sylvio' and that others from Merck Puerto Rico made positive statements" (¶112).

## II. Plaintiff's Theory of the Case

To summarize, plaintiff believes that he was discriminated against in relation to reprimands for his failure to timely complete the exams and receive certification and for the late filing of two expense reports.

With regard to the time for completion of the exams, Baltodano claims that although the same time is given to all the managers, there is a disparate and prejudicial impact on managers coming from other regions because those already in the Puerto Rico region could get product certifications prior to being promoted to sales manager,[4] thereby having fewer exams to pass in the same allotted time. He further claims, on this matter, that the Puerto

---

[3] Baltodano's Unsworn Statement, Docket entry 31, Ex.1, ¶9.

[4]See, plaintiff's Opposition to Defendant's Supporting Statement of Material Facts, docket entry 33, p. 5.

CIVIL 07-1632CCC                             5

Rico managers were allowed to work in the field on a specific product even though they had not received the certification for it.[5]

As to the expense reports, plaintiff contends that he further suffered discrimination in that "[on] information and belief, Mr. Baltodano was the only Merck employee to be disciplined in any fashion for failing to submit expense reports on time" (¶60). He states that "Vázquez said that since [he] already had two written memoranda in his files, her only option was to fire him due to his behavior of not complying with [the expense report] policy" (¶92).

Merck bases its Motion for Summary Judgment on its contention that Baltodano was terminated due to his repeated violations of Merck's employment policies and regulations, which constitute good cause under Puerto Rico law. It further contends that plaintiff failed to demonstrate a prima facie cause of national origin discrimination under Puerto Rico law. That is, he had not provided the necessary evidence to demonstrate a discriminatory animus in his termination. Finally, it is argued that the breach of contract claim, arising from withdrawal of stock options, and the damage claim, are dependent on the absence of just cause for termination, and therefore, should also be dismissed.

With regard to the reprimand for failing to complete the certification exams, plaintiff claims the time limits were discriminatory against persons from outside Puerto Rico because managers in this region had the advantage of being able to get a head start by doing certifications before being promoted to managerial positions.

As to his failure to timely file expense reports, Baltodano discusses only having filed the November report late, on December 15, 2006 because he had been at a meeting in early November 2006 .

---

[5] Id., at p.10

CIVIL 07-1632CCC                                                6

## III. Standard for Summary Judgment

Summary Judgment "is proper if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that the moving party is entitled to a judgment as a matter of law." Rule 56 of the Federal Rules of Civil Procedure; Eileen McCarthy v. Northwest, 56 F.3d 313, (1st Cir. 1995). The nonmoving party must establish the existence of at least one factual issue that is both genuine and material to defeat a properly supported motion. Brennan v. Hendrigan, 888 F.2d 129, (1st Cir. 1989). The role of a Motion for Summary Judgment is to "pierce the boilerplate of the pleadings and assay the parties proof in order to determine whether trial is actually required." Wynne v. Tufts University, 976 F.2d 791,794 (1st Cir. 1999).

Although a Court analyzing a summary judgment motion must look at the record in the light most favorable to the non-moving party, the Court may not rely merely on unsubstantiated allegations. Rather, the non-moving party may only overcome a summary judgment motion upon presentation of proof sufficient to raise a genuine issue of material fact. See, Daury v. Smith, 842 F.2d 9, 11 (1st Cir. 1988); Cruz v. Crowley Towing, 807 F.2d 1084 (1st Cir. 1986). Said another way, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion [...]." Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).

On issues where the nonmovant bears the ultimate burden of proof at trial, he may not defeat a motion for summary judgment by relying upon evidence that is "merely colorable" or "not significantly probative." That is, the evidence he offers" must be significantly probative of specific facts." Prescott v. Higgins, 538 F.3d.32, 40(1st Cir. 2008); Pérez v. Volvo Car Corp, 247 F.3d. 303, 317 (1st Cir. 2001).

Summary judgment is appropriate even when elusive concepts like motive or intent are in play if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation. Feliciano v. El Conquistador, 218 F.3d 1(1st Cir.

CIVIL 07-1632CCC                                         7

2000), citing Medina Muñoz v. R.J. Reynold Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990). Therefore, the non-moving party's failure to advance proof of the essential elements to establish their cause of action, and on which they have the burden of proof, warrants the dismissal of the case through Summary Judgment. Celotex v. Catrett, 477 U.S. 37, (1986).

Of particular importance in the examination of the supporting evidence is that we must be mindful that hearsay evidence offered in support of a motion for summary judgment is subject to the same prohibitions and restrictions as that introduced at trial. An "affidavit must set out facts that would be admissible in evidence. Hearsay evidence, inadmissible at trial, cannot be considered on a motion for summary judgment." S.E.C. v. Ficken, 546 F.3d. 45, 53 (1st Cir. 2008).

In Dávila v. Corporación de Puerto Rico Para La Difusión Pública, 498 F.3d. 9 (1st Cir 2007), the plaintiff relied on an affidavit stating that others had told him that his supervisor considered him too old for the job. But the plaintiff did not offer an affidavit from any person who actually heard the alleged statement. Given this omission, we ruled that the statement was hearsay under the Fed.R.Evid. 801(c) and reiterated that it is black-letter law that hearsay cannot be considered on summary judgment. Bennett v. Saint-Gobain Corp., 507 F.3d. 13, 28-29 (1st Cir. 2007). See, also, Montfort-Rodríguez v. Rey Hernández, 504 F.3d. 221, (1st Cir. 2007); Dávila v. Corporación de Puerto Rico Para la Difusión Pública, 498 F.3d. 101 (1st Cir. 2007).

### IV. Law 100 Claim for National Origin Discrimination

Law 100 29 L.P.R.A. §46, provides in pertinent part, "Any employer who discharges, lays off or discriminates against an employee . . . because of his/her . . . national origin... shall incur civil liability." We initially note that the complaint does not state Baltodano's national origin. The record reflects that he graduated from the University of Costa Rica

CIVIL 07-1632CCC                                              8

(PDTx.15[5]) and obtained an MBA from the University of California ( D.Ex 1[6]).  Plaintiff states that he began working for Merck in April,1996 in Nicaragua (¶10).  He was then transferred to Costa Rica, after which he worked in Florida before coming to Merck's Caribbean region in Puerto Rico.

Plaintiff relates incidents such as Vázquez' comments that the CANDEAN region from which plaintiff transferred never reached the Caribbean region's revenue figures and that business managers who transferred in from other regions had to work harder and pass more certification exams in the same period of time as evidencing national origin discrimination.[7]  These comments, however, rather than reflecting an attitude toward national origin, are expressions regarding differences between Merck's Caribbean and CANDEAN regional offices.  Plaintiff's allegation that the facially neutral policy of the same time allowance for completing product certifications has a disparate impact on "non-Puerto Ricans" is also a function of regional differences.  The disparate impact results from differences in operational procedures–the CANDEAN sales representatives do not begin the product certifications procedures when the sales representatives in this region do.[8]

Similarly, Baltodano's averments that, for example, Vázquez "made [him] feel inferior because he was from a different region," (Complaint, ¶22, our emphasis) and that "this type

---

[5] This abbreviation will be used for citations to the transcript of plaintiff"s deposition, found in defendant's statement of uncontested facts, docket entry 29, exhibit 24, and in various exhibits to plaintiff's opposition, docket entry 31.

[6] This abbreviation will be used for exhibits to defendant's statement of uncontested facts.

[7] The actual time frame is not stated.  The initial date for completion of the exams was "close to the end of June, 2005 "(docket entry 29, Ex.12, ¶4).

[8] We also note that the entire argument is immaterial to plaintiff's claim.  He had been in Puerto Rico for a year and a half before the certification issue arose, thereby placing him in the same position as Puerto Ricans for taking the exams in advance of his promotion.  He has not alleged that he was denied the opportunity to do this.

CIVIL 07-1632CCC                                  9

of feedback was not appropriate in Puerto Rico, and that [he] should be more careful <u>since he was from a different region</u>," (Id., ¶29, our emphasis) also reflect Vázquez' chauvinistic attitudes about the Caribbean region.

Plaintiff's Exhibit 13, the statement under penalty of perjury by Francine Matheus, plaintiff's former co-worker, which Baltodano alleges is made in support of his national origin discrimination claim, is of little assistance. The one-paragraph document reflects that she is a resident of Miami, Florida. It states only that during a meeting in 2005 with plaintiff and her supervisor at Merck, Zulma Wagner, the supervisor told them that they "would have to work harder than Merck Employees from Puerto Rico in order to achieve the same results in terms of advancement." It would, however, be speculative to draw the forbidden inference of national origin discrimination from the range of possibilities, <u>see</u>, <u>e.g.</u>, <u>Marrero-Gutiérrez v. Molina</u>, 491 F.3d. 1, 10 (1st Cir. 2007), especially where, in this case, all other comments refer to regional differences.

Similarly, Baltodano tries to inject the nationality issue in other contexts. He argues extensively that he was reprimanded and eventually discharged for what he describes in his complaint as two occasions of late filing of his expense reports, whereas others did not receive such warnings. He has failed to provide any evidence whatsoever that the alleged disparate treatment is related to the fact that he is not of Puerto Rican origin. The attempts to bring national origin into the equation are merely unsupported conclusions, his own interpretation of others' motivation, and speculation, as illustrated by the following averments in the complaint:

> ¶32. Ms. Vázquez made it clear that Mr. Baltodano's feedback to her was not important because he was not from Puerto Rico and therefore, . . . he did not and could not understand the local culture.

> ¶37. In all cases, however, Mr. Baltodano was held to a higher standard [of complying with company policy than his peers who were from Puerto Rico.

CIVIL 07-1632CCC				10

>¶42. Merck and Ms. Vázquez discriminated against Mr. Baltodano by treating other representatives and managers more leniently regarding similar tasks.
>
>¶60. On information and belief, Mr. Baltodano was the only Merck employee to be disciplined in any fashion for failing to submit expense reports on time.
>
>¶75. . . . Ms. Vázquez did not support Mr. Baltodano [in his quest to transfer back to Florida] because of her discriminatory attitude against him as a non Puerto Rican.

As plaintiff tried to explain at his deposition:

>. . . when she told me you got to be very careful now you are new and taking a very important management position, you will be the leader of compliance and because the region you come from is not F.D.A. regulated you have to be very careful on what you say and, I have to tell you this is not CANDEAN Region That's how she said it. This is a–different region where it is more strict. We are more strict with the policies and she also told me let's put into perspective, the CANDEAN Region and the Caribbean Region, you know, have a different sales goal.
>
>   Puerto Rican region–not the Puerto Rican region–the Carribbean region, although 80 percent is Puerto Rican, has been constantly many, many years being recognized as a better region to work for than CANDEAN. That's how she said it. I will repeat it. The CANDEAN Region–she said the Caribbean region has always reached the quota, always reached the revenue, has always been on top of performance and, I want to tell you that because the F.D.A. regulated and we are very more strict probably; okay.
>
>   This is again–she didn't say it like that but, she insinuated that I was coming to a more–to a different region.

PDTx. 87-88.

In sum, we find that plaintiff's own allegations and explanation given at his deposition demonstrate that the comments made and actions taken by Merck, flow from the fact that he came from a different Merck region, and are unrelated to national origin.  Therefore, Baltodano has failed to make a prima facie case for national origin discrimination.  His cause of action under Puerto Rico Law 100 fails.

CIVIL 07-1632CCC                              11

## V. Law 80 Claim for Unjust Dismissal

Law 80 29 L.P.R.A. §185a provides indemnification for employees who are discharged from their positions without just cause. A dismissal without cause is "a discharge made by mere whim or fancy of the employer or without cause related to the proper and normal operation of the establishment §185b. <u>Alvarez v. Pepsi Cola of Puerto Rico Bottling Co.</u>, 152 F.3d. 17, 28 (1st Cir. 1998). Merck contends that Baltodano's discharge constituted just cause under §185b(c): the employee's repeated violations of the reasonable and regulations established for the operation of the establishment, provided a written copy thereof has been opportunely furnished to the employee.

Plaintiff attacks Merck's affirmative defense of just cause for his dismissal on various fronts: first, that the Employee Manual does not characterize the late filing of an expense report as a violation of the regulations and that providing an explanation for the tardiness excuses it; and, second, his minor infractions did not merit dismissal and other managers, he believes, were not disciplined for filing late expense reports.[9]

We begin by examining Merck's Ex.10 – Work Regulations Policy # P-101 revised 6/20/2005. The policy statement provides, in pertinent part, "This policy also helps managers and employees understand which behaviors would warrant disciplinary action and in this way prevent deterioration of employee performance" page 1.

The disciplinary procedure is set forth at page 2:

> The Company's progressive disciplinary actions include, but is not limited to, the following, at the discretion of Merck's management, as may be determined by the Human Resources Department and the employee supervisor next level approval:
>
> <u>Written Warning</u>: Will entail a written warning or final warning of admonishment for the employee's file.

---

[9] "Mr. Baltodano believes that Merck did not reprimand any other Business Manager, but is not certain." Plaintiff's opposition, page11, fn 4. As of the date of this opinion, more than six months after filing his opposition, he has not tendered any admissible evidence to support this belief.

CIVIL 07-1632CCC                              12

>       Three (3) days suspension:  Will entail a written warning or final warning for the employee's file and three days suspension....
>
>       Dismissal:  Will entail the definite termination from employment with the company and must be documented for the employee's file.

The Section on "Compliance" at pages 3-4, provide, in pertinent part:

>       Total adherence to the Company Work Regulation is essential.... Accordingly, an employee whose personnel records exhibits multiple or diverse infractions to these work rules, therefore demonstrating neglectful disregard towards the Company Work Regulation, shall be subject to appropriate disciplinary action, including dismissal, as may be determined by the Human Resources Department and next level approvals.

The following are some inappropriate behaviors, related to work performance, not acceptable under the Company's standard of conduct, found at page 5 and 6:

>       1. Failure to follow work instructions issued by the Company, written or verbal (insubordination).
>
>       5. Failure to render required reports and official documentation on time or late without an acceptable justification.
>
>       9. Failure to comply with policies and procedures governing every business promotion-related practice (Field Policy 1)
>
>       22. Failure to comply with expense reimbursement policy and procedures.

(Our emphasis.)

Baltodano signed the Policy Receipt Acknowledgment Form, ANEX A, stating that he had read and understood the Work Regulation Policy on July 1, 2005.

Field Policy Letter #1, defendant's Exhibit 11, provides that field based employees, which includes managers such as plaintiff, are not allowed to discuss the use, benefits or therapeutic effects of a product with anyone outside of Merck until they have met all Training Department certification requirements for the product.

CIVIL 07-1632CCC                              13

Defendant's Exhibit 14 is Policy Letter No. 20, which contains the Expense Policies and Reimbursement Procedure,[10] January 30, 2004 and May 5, 2006 revisions. The provisions related to the submission of expense reports are essentially the same in both revisions and provide, in pertinent part:

> On-line system eZ EXPENSE
>
> 1. "All expense reports should be submitted via eZ EXPENSE <u>within 30 calendar days of incurring the expenses. Expenses presented after 30 calendar days require employee's explanation</u>.... Employees should limit expense submission to two expense reports per month...."

(Our emphasis.)

Before entering the two areas, which were the alleged "just cause" for plaintiff's dismissal, that is, failure to comply with Merck's regulations regarding product certification and the timely filing of expense reports, we must comment on Baltodano's continued reliance on his excellent performance, his high sales numbers, promotions and merit increases of his salary. Merck has never raised his sales performance as a reason for, or in any way contributing to, the decision to dismiss him.

## A. Failure to Timely Complete Certifications

Baltodano concedes, at ¶36 of his Complaint, "that he had certain administrative failures, but <u>he accepted responsibility for not complying exactly as the company policy requires</u>," at ¶¶38-39 he accepted that he had failed to take all of his product test by the established date, the end of June 2005, but stated that the company should allocate more

---

[10] The Scope of the Policy and Procedures states, in pertinent part: "This policy applies to professional sales representatives and office employees of Merck Sharp & Dohme (I.A.) Puerto Rico Branch (the Company)."

CIVIL 07-1632CCC                                    14

time to managers in order to complete the tests.[11]  The final warning on the matter of the failure to complete the product certifications by the agreed upon date, however, did not flow from the failure to meet that deadline.  Rather, the reprimand was given after he missed the revised date of September 23, 2005, representing an almost three-month extension for plaintiff to finish the three certifications.  (See, Defendant's Exhibit13, Final Warning of December 7, 2005.)

The most glaring hole in plaintiff's certification argument, however, is the fact that Baltodano had been in the Caribbean region for over a year and a half before he was promoted to National Business Manager in early June 2005.  Therefore, as he stated in his opposition, "those already in the Puerto Rico region could get product certifications before prior to being promoted to sales manager[12] he could have gotten an early start on the certifications as did other employees in the Caribbean region who became a Field Based Employee.

Baltadano also argues that he and two others business managers who were not certified on the product Singulair were, nonetheless, in the field selling that product. (Plaintiff's EX. 1 ¶3).  This fact, however, is immaterial; he, too, was also in the field without having been certified on Singulair.  In this instance, he was treated the same as the other

---

[11] Wanda Perry unsworn statement, Merck's Exhibit 12, includes numerous emails regarding plaintiff's product certification efforts as sub-exhibits. Most of the sub-exhibits are in Spanish for which translations were never provided, although the court granted defendant's motion to submit them at a later date. (See, order of August 11, 1008, docket entry 50). Additionally, many of the sub-exhibits contain phrases that have been blackened out, in violation of Local Rule 7.1(f), which requires that "[a]ll documents submitted to the Court as exhibits shall be complete, legible copies." We, therefore, do not consider the statements of uncontested facts supported only by the exhibits submitted in Spanish or edited by defendant.

[12] See, plaintiff's Opposition to Defendant's Supporting Statement of Material Facts, docket entry 33, p. 5.

CIVIL 07-1632CCC					15

managers.  Moreover, the absence of his certification on Singulair is not relevant to his warning for not timely completing the certifications for his three products: Vytorin, Zetia and Fosamax.

## B.  Untimely Filing of Expense Reports

With regard to his failures to timely file the expense reports, which were due within thirty days of incurring the expense, Baltodano provided the following history of his submission of expense reports in his complaint:

> From January 2006 to August 2006, Mr. Baltodano submitted all his expense reports within the established deadline according to the expense report policy. Throughout [August 2006 to December 2006], Mr. Baltodano submitted his expenses on time according to the policy which states that expenses should be submitted within 30 days of the expense incurred, except that for the month of September, when he submitted the expense within 30 to 60 days of the expense incurred.
>
> During the first week of November 2006, all business managers and the majority of the sales force from PR attended a . . . meeting in Houston, Texas.  For the second time . . . Mr. Baltodano did not submit a $100.00 expense report within 30 days of the expense incurred. Instead, [he] submitted this expense report within 30 to 60 days of the expense incurred. This second violation to the expense report policy under Ms. Vázquez's direct supervision was enough for her to dismiss Mr. Baltodano a month later on January 18, 2007.

¶¶51,53, 55-58.

Statements made by plaintiff in his unsworn statement, Exhibit 1 supporting his opposition to the defendant's statement of uncontested facts, contradict his allegations and support the untimeliness of his filings, notwithstanding their misstatement time frame:

> ¶7, "My expense reports during 2006 were no more than a month late in submission."
>
> ¶12, "Ms.  Vázquez warned me of a supposed violation of the expense report policy even though the 30 days had not expired from the close of the prior month.  I informed Ms. Vázquez of my September expenses in late October 2006.  It was Ms. Vázquez

CIVIL 07-1632CCC                                       16

> who delayed in opening the e mail. The October expenses were due at the end of November. *I complied with the rule by submitting the October expenses by the end of November.* Moreover, the policy itself does not describe failure to comply with this rule as any sort of infraction.

Emphasis in the original.

Merck, in support of the plaintiff's pattern of untimely filing his expense reports, submits a portion of Baltodano's deposition testimony regarding the issue. Plaintiff acknowledged having submitted expenses more than 60 days after incurring them about twice and more than 30 days after incurring them more than twice but no more than five times (PDTx. 63). Defendant's Exhibit 20 -21, on the same issue include print-outs of plaintiff's expense reports. Exhibit 20 is the report for the expenses incurred from September 2, 2006 through September 29, 2006 was submitted on October 27, 2006. The nineteen expenses on the list having been incurred on or before September 26, 2006, they were, therefore, all untimely filed. Exhibit 21 is the report for expenses from October 2, 2006 through October 27, 2006, which was untimely filed on November 30, 2006. An extensive pattern of filing his reports late is narrated in the unsworn statements of Wendy Perry and Nilda Vázquez, Exhibits 12 and 19, respectively.

Plaintiff implies that the other managers who attended the meeting in early November 2006 filed their expenses reports late, but provides no evidence to support it and that, generally, managers who did so were not reprimanded as he was. He states that all the business managers filed their November, 2006 expense reports late. See, plaintiff's opposition, page 3, and that, although other Business Managers, both from Puerto Rico, admitted to not submitting their expense vouchers in a timely manner, but neither of them was disciplined.[13]  Id., at page 11.

---

[13] Plaintiff repeatedly argues that other managers and employees untimely submitted expense reports and were not disciplined. It suffices to say that this is a constant theme of his defense and, therefore, we do not include other examples of it.

CIVIL 07-1632CCC                              17

Baltodano's purported evidence in support of claims of different treatment in expense report filings, however, never advances beyond arguments and hearsay statements. He acknowledges that it is only his belief that other managers untimely submitted expense reports but were not disciplined. See, footnote 9, supra; PDTx. 131; Plaintiff's Unsworn Statement, Exhibit 1,¶ 3.

Plaintiff's deficiencies in the certification process and expense reporting have been carefully documented, and fall within Merck's parameters for discharge, as contained in its manual, above. Accordingly, we find that Merck had just cause to terminate Baltodano's employment and, therefore, his claim under Law 80 falls.

## VI. Claim Under Puerto Rico Constitution Article II, Section 8

Although not cited in the complaint's jurisdictional statement, plaintiff includes a claim under Claim Under Puerto Rico Constitution Article II, Section 8, which provides: "Every person has the right to the protection of law against abusive attacks on his hone, reputation and private or family life." (Official translation.) Plaintiff, at ¶119 of his complaint states: "defendants' aggressive attack on plaintiff's honor, reputation and family life has harmed plaintiff."

This claim is no more than this conclusory boilerplate. There is nothing alleged in the complaint to warrant its presence; it is not further mentioned or analyzed in any of plaintiff's motions. We go no further, as the claim is entirely meritless.

## VII. Breach of Contract Claim under 31 L.P.R.A.§§3391-3525

Plaintiff alleges a breach of contract in Merck's alleged failure to honor his right to exercise his stock options. Pursuant to the Employee Manual, one of the benefits of employment with Merck is the grant of stock options for employee purchase. See, Merck's Ex. 8, Section VI. Total Compensation, A-2,¶3. According to the Stock Option Terms for

CIVIL 07-1632CCC							18

1999, included as part of defendant's Ex. 23, 1999 being the year in which he was granted the options, "If your employment is terminated as a result of your deliberate, willful or gross misconduct, all stock options will be forfeited immediately upon you receipt of notice of such termination." Defendant's uncontested material fact No. 27 on this point having been admitted by plaintiff, his termination for just cause defeats his breach of contract claim.

## VII. Article 1802 (Mental and Moral Damage)

Aside from the boilerplate incorporation of all the previous paragraphs of the complaint, plaintiff fails to identify which specific facts create this cause of action. Leftover from our previous discussions are the anecdotes as to Nilda Vázquez' failure to support his efforts to transfer back to Florida in the summer of 2006, and efforts to secure a position with Steifel Labs in February, 2007.

With regard to his conclusory allegation that Vázquez did not support him because he was not from Puerto Rico, Defendant's Exs. 17-18, a partial set of e-mails between between Illia Rodríguez Merck's Director of Human Resources, and Emilia Martínez, whose position at Merck in Miami is unclear, refute plaintiff accusation. They clearly reveal Merck's efforts on Baltodano's behalf to help him relocate to Miami[14].

Plaintiff contends that, on Monday, March 26, 2007, he was notified that he had been

---

[14] E.g. from email of Emilia Martinez to Illia Rodriguez on June 20, 2006:

> As far as the Miami Regional Office, it may be difficult. At this time, we don't have any foreseeable needs , but I am also passing the email along to ....

> Can we get from you or Sylvio's manager(s) a summary of Sylvio's accomplishments since his move to Puerto Rico? What new areas of exposure has he gained and how has he done?

Defendant's Exhibit 17, p.1, 3rd email.

selected for a position with Steifel Laboratories (Complaint ¶105).  He contends that Steifel's Vice Present, Bresley Jaramillo, called him the following day to tell him that the offer was rescinded (¶109).  Plaintiff avers that, ". . . Mr. Jaramillo stated openly that the reason he had to take back the job offer was because . . . Steifel received a negative reference from [Merck-Puerto Rico] about Mr. Baltodano" (¶111).  "Mr. Jaramillo said that he was informed that Mr. Baltodano had left the company in bad terms and, that Mr. Simich said he had, 'no comments on Sylvio' and that others from Merck Puerto Rico made positive statements" (¶112).  "Mr. Jaramillo expressed his concern for Mr. Baltodano on a personal level and said that because of the negative reference that was registered in Mr. Baltodano's hiring file, he could not hire him" (¶113).

Once again, plaintiff has provided nothing more than his own rendition of "facts" allegedly related to him by Jaramillo, which is more inadmissible double and triple hearsay. Better evidence such as affidavits, sworn or unsworn statements under penalty of perjury from Jaramillo and/or Simich, which could have redressed some of the admissibility problems, were not offered in support of these allegations.

The Court having found that all of plaintiff's claims fail, the  defendants' Motion for Summary Judgment **(docket entry 28)**is GRANTED and the complaint is DISMISSED.

SO ORDERED.

At San Juan, Puerto Rico, on March 31, 2009.

                                        S/CARMEN CONSUELO CEREZO
                                        United States District Judge